## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOSEF SATTERFIELD,<br><br>                Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, *Acting Commissioner of the Social Security Administration*,<br><br>                Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No.  2:13-CV-00981-EJF<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff Josef Satterfield asks this Court to reverse or remand the final agency decision denying him Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, *see* 42 U.S.C. §§ 401–434, 1381–1383f (2010).  The Administrative Law Judge ("ALJ") determined that Mr. Satterfield did not qualify as disabled within the meaning of the Social Security Act.  (Admin. R. Doc. 11, certified copy tr. of R. of admin. proceedings: Josef Satterfield (hereinafter "Tr. __").)  Mr. Satterfield contends the ALJ erred in discounting his and Dr. Hendrix's—the treating physician's—credibility and by failing to include all of Mr. Satterfield's limitations in his Residual Functional Capacity ("RFC").  (Pl.'s Opening Br. at 2, ECF No. 23.)  The Court finds the ALJ's decision deficient in its explanation of the basis for finding Mr. Satterfield's and Dr. Hendrix's credibility lacking.  Those failures also limit the Court's ability to review the RFC determination.  Based on the Court's[1]

---

[1] The parties jointly consented to this Court's determination of the case under 28 U.S.C. § 636(c). (ECF No. 15.)

careful consideration of the record, the parties' briefs, and relevant legal authorities, the Court REMANDS the Commissioner's decision for further explanation.[2]

## PROCEDURAL HISTORY

In February 2011, Mr. Satterfield filed for DIB and SSI, alleging disability beginning June 10, 2009.  (Tr. 14.)  The Regional Commissioner denied Mr. Satterfield's claims on July 6, 2011, and again upon reconsideration on November 3, 2011.  (Tr. 14.)  At Mr. Satterfield's request, an ALJ held a hearing on January 15, 2013 to consider the matter.  (*Id.*)  On January 31, 2013, the ALJ issued a decision finding Mr. Satterfield not disabled (the "Decision").  (Tr. 11.) The Appeals Council denied Mr. Satterfield's request for review on September 19, 2013, (tr. 5), making the ALJ's Decision the Commissioner's final decision for purposes of judicial review under 42 U.S.C. §§ 405(g) and 1383(c)(3).  *See* 20 C.F.R. §§ 404.981, 416.1481.

## Factual Background

Mr. Satterfield, born March 21, 1965, has a high school equivalency degree and work experience as a cashier, machine cleaner, plastic sheeting laborer, and artificial inseminator.  (Tr. 71, 117, 393–94.)

Prior to his alleged disability onset date Mr. Satterfield had type I insulin–dependent diabetes.  (Tr. 351.)  Between March 2006 and July 2007 Mr. Satterfield also reported "poor memory."  (Tr. 191; *see also* 192, 193, 197.)  In 2007, Dr. Bruce Hendrix, Mr. Satterfield's treating physician, described the issue as "[m]emory problems of uncertain etiology."  (Tr. 195.) In August 2007, Mr. Satterfield reported to Dr. Hendrix that he had "pain on the anterior aspect of his left foot with some swelling," which Dr. Hendrix observed as redness and swelling of the

---

[2] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the Court concludes it does not need oral argument and will determine the appeal on the basis of the written memoranda.

2

first metatarsophalangeal joint.  (Tr. 189.)  Dr. Hendrix noted in January 2009 that Mr. Satterfield's "[d]iabetic control has been poor."  (Tr. 187.)

Mr. Satterfield alleges disability beginning on June 10, 2009, (tr. 370), due to diabetes and vision impairment.  (Tr. 116.)  Subsequently, Mr. Satterfield also added memory problems and pain in his right leg and hip to his disabling conditions with onset dates in July and September of 2011.  (Tr. 153, 161.)

**1) Diabetes**

Dr. Hendrix regularly reviewed Mr. Satterfield's diabetic control.  (*See e.g.* tr. 207, 218, 220.)  Mr. Satterfield's A1C tests, used to determine the presence of diabetes and the degree of glycemic control, reported A1C percentages ranging from 6.7 percent to 7.9 between January 2009 and June 2010, (tr. 204), with them usually coming in less than seven percent, (tr. 218). Treating physicians determine each patient's target A1C percentage, but it is generally less than seven percent.  (Def.'s Br. 2 n.3, ECF No. 35.)  Dr. Hendrix modified Mr. Satterfield's blood sugar medications in response to abnormal blood test results.  (Tr. 187, 219.)  During a March 29, 2010 visit, Dr. Hendrix determined that Mr. Satterfield's diabetic control, as measured by logs recording blood sugar levels over time, remained erratic but became "much better" as treatment progressed.  (Tr. 220.)

Mr. Satterfield's logs showed he checks his blood sugar daily at breakfast, lunch, dinner, and before going to bed.  (Tr. 230.)  This pattern varied over time, sometimes showing only three checks a day.  (*See* tr. 228, 244.)  Mr. Satterfield stated in February 2011 that he gives himself six to seven insulin shots per day and checks his blood sugar six to eight times per day.  (Tr. 130.)  In March 2011, Mr. Satterfield described his diabetic control as "better than it [had] been in the

past." (Tr. 253.)  His blood sugar reached 300 only when Mr. Satterfield "forgot to take an insulin injection." (Tr. 253.)

In October 2011, at the request of the state agency, Raul Weston, M.D. examined Mr. Satterfield, who reported twice-monthly occurrences of low blood sugar and constant fatigue. (Tr. 309.)  Mr. Satterfield reported to Dr. Weston that he checked his blood glucose levels six times daily with values averaging between 150 and 200.  (*Id*.)  Mr. Satterfield reported taking insulin for nineteen years but denied "taking oral medication, following a diabetic diet, exercising regularly, [or] being hospitalized for his diabetes[.]" (*Id*.)  Dr. Weston concluded Mr. Satterfield had diabetes with "appropriate blood sugar control." (Tr. 312.)  "Overall," Dr. Weston wrote, "I do not find anything based on physical exam results which would significantly limit or impair claimant in any way." (Tr. 313.)

In December 2012, Dr. Hendrix filled out a diabetes RFC form.  (Tr. 351–54.)  Dr. Hendricks reported Mr. Satterfield has type I insulin-dependent diabetes.  (*Id*.)  Dr. Hendrix determined Mr. Satterfield requires two unscheduled breaks per day, each lasting fifteen to twenty minutes.  (Tr. 354.)  Dr. Hendrix thinks Mr. Satterfield's impairments will require him to be "off task" for twenty five percent of each workday.  (Tr 354.)  Dr. Hendrix stated Mr. Satterfield's impairments, symptoms, and limitations "possibly" existed since June 10, 2009. (Tr. 353.)

Dan Heath, Mr. Satterfield's former employer, also reported concerns about Mr. Satterfield's "numerous stops" to check blood sugar levels and administer insulin injections causing lost productivity.  (Tr. 355.)

**2)  Vision Impairment**

Steven Taggert, O.D., in August 2011 submitted a short letter in response to a request from Social Security Disability Services, stating that his April 2010 examination of Mr. Satterfield rated his corrected visual acuity at 20/20 for the right eye and 20/25 for the left eye. (Tr. 284.)  Dr. Taggart found Mr. Satterfield's eye health normal, apart from a need for corrective lenses.  (*Id.*)  Kyle Andrus, O.D., an optometrist, examined Mr. Satterfield in October 2011 at the request of the state agency.  (Tr. 298–305.)  Dr. Andrus noted diabetes with ophthalmic complications; mild and stable non-proliferative diabetic retinopathy; hyperopia; astigmatism; and presbyopia.  (Tr. 303.)  He did not find Mr. Satterfield required new glasses.  (Tr. 303.)  That same month, Dr. Weston reported that Mr. Satterfield has a correctable vision impairment.  (Tr. 313.)

**3)  Memory**

In July 2010, because Mr. Satterfield regularly complained of memory problems and as part of completing a physical impairment/disability report for the Department of Workforce Services, Dr. Hendrix administered a mini-mental status examination to evaluate Mr. Satterfield's basic mental functioning.  (Tr. 238.)  Mr. Satterfield scored twenty-nine out of thirty, relatively average.  (*Id.*, tr. 290.)

An August 2, 2010 physical performed by Dr. Hendrix suggested little correlation existed "between the severity of hypoglycemia and the subsequent [memory] impairment that [Mr. Satterfield] senses."  (Tr. 231.)  At a February 2011 examination, Mr. Satterfield again complained of poor memory.  (Tr. 253.)  Dr. Hendrix noted Mr. Satterfield's complaints of memory loss on the diabetes RFC Report.  (Tr. 351.)

In October 2011, Mr. Satterfield underwent a psychological exam with Dr. Kockler, Ph.D. (Tr. 288, 295.)  Dr. Kockler diagnosed Mr. Satterfield with an unspecified adjustment disorder and somatoform disorder and determined Mr. Satterfield "does have the capacity to manage financial affairs."  (Tr. 295.)  Dr. Kockler rated Mr. Satterfield's memory functioning as "b[e]low average."  (*Id*.)

That same month, Dr. Andrus, the agency optometrist, noted during his examination of Mr. Satterfield that he had intact recent and remote memory, although he had mild micro-aneurysms in his retina.  (Tr. 302.)  Melvin Sawyer, Ph.D., a state agency psychologist, reviewed Mr. Satterfield's medical records in October as well and found no severe mental impairment. (Tr. 317–18, 321–34.)

In a letter dated December 6, 2012, Mr. Heath—who operates a pest-control business— stated that Mr. Satterfield struggled to remember the information needed to pass a required licensing test, failing twice.  (Tr. 355.)  Mr. Heath asserted that Mr. Satterfield is not employable. (Tr. 355.)

**4)  Shoulder, Leg, and Hip Pain**

In a July 10, 2009 examination, Dr. Hendrix diagnosed Mr. Satterfield with "mild edema" (swelling) in the right leg.  (Tr. 211.)  At a March 29, 2010 visit, Dr. Hendrix noted Mr. Satterfield's foot swelling had "seemingly resolved."  (Tr. 220.)  An August 2, 2010 physical performed by Dr. Hendrix noted a return of foot swelling.  (Tr. 231.)

In September 2010, Mr. Satterfield received pain medication and muscle relaxers to alleviate lower back pain.  (Tr. 245.)  X-rays taken in July 2012 showed mild degeneration of the mid- to lower- thoracic spine.  (Tr. 336.)

On June 6, 2011, Dr. Hendrix noted Mr. Satterfield "likely [had] impingement syndrome, rotator cuff pathology" in response to complaints about right shoulder pain.  (Tr.  256.)

On June 24, 2011, David Peterson, M.D., a state agency physician, reviewed Mr. Satterfield's medical records and found Mr. Satterfield limited to occasional overhead lifting with his right arm, lifting or carrying twenty pounds, frequently lifting or carrying ten pounds, and sitting, standing, or walking six hours in an eight-hour workday.  (Tr. 262–65.)

In October 2011, Mr. Satterfield told the state agency examiner, Dr. Weston, that he has shoulder pain, which Dr. Weston acknowledged and noted mild range of motion limitations despite five out of five arm-strength.  (Tr. 309, 312–13.)

A follow-up X-ray from October 3, 2011 showed mild degeneration at the acromioclavicular joint.  (Tr. 308.)

In November 2011, Lewis Barton, M.D., a state agency physician, reviewed the medical records and found Mr. Satterfield did not have a severe impairment.  (Tr. 319–20.)

**5)  Mr. Satterfield's Daily Activities**

Mr. Satterfield reports that he can feed his cats, tend to his personal care, make himself breakfast and lunch, clean his house, wash dishes, mow and water his lawn, shovel snow, drive a car, shop for groceries, manage his finances, play solitaire and word games daily, play on the computer, watch television, and attend church weekly.  (Tr. 131–34, 142–50, 179–80.)

At the administrative hearing, Mr. Satterfield testified that he experiences daily pain in his right shoulder.  (Tr. 382.)  Using a ten-point scale, Mr. Satterfield described his minimum shoulder pain as "a 3 maybe—maybe 4, occasional."  (Tr. 384.)  Nonetheless, when asked to measure his present pain level, he described it as "about a maybe a 1 or a 2."  (Tr. 385.)  He described his maximum pain as "about a 9" out of ten.  (Tr. 385.)  He stated that he has tingling

7

in his legs from the diabetes occasionally and experiences blurred vision twice per year.  (Tr. 386.)  Mr. Satterfield testified that he experiences about ten to fifteen "bad days" each month but agreed he might have to miss only one day of work a month.  (Tr. 391.)

## STANDARD OF REVIEW

42 U.S.C. §§ 405(g) and 1383(c)(3) provide for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA").  The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards.  42 U.S.C. §§ 405(g), 1383(c)(3); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  The Commissioner's findings shall stand if supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly contradicted by other evidence."  *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).[3]  The standard "requires more than a scintilla, but less than a preponderance."  *Lax*, 489 F.3d at 1084. "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion."  *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotation marks and citations omitted).  Moreover, "[a] finding of 'no substantial evidence' will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence."

---

[3] Courts apply the same analysis in determining disability under Title II and Title XVI.  *See House v. Astrue*, 500 F.3d 741, 742 n.2 (8th Cir. 2007).

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Lax*, 489 F.3d at 1084 (internal quotation marks and citations omitted). The court will "review only the *sufficiency* of the evidence." *Oldham v. Astrue,* 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). The court does not have to accept the Commissioner's findings mechanically, but must "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks and citation omitted). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Lax*, 489 F.3d at 1084 (*quoting Zoltanksi v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thomson v. Sullivan*; 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

**Analysis**

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-step sequential evaluation.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Williams v. Bowen*, 844 F.2d 748, 750-53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;
(4) The impairment prevents the claimant from performing his or her past work; and
(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. §§ 404.1520, 416.920.  The claimant has the initial burden of establishing the disability in the first four steps.  *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).  At step five, the burden shifts to the Commissioner to show that the claimant retains the ability to perform other work existing in the national economy.  *Id.*

The ALJ evaluated Mr. Satterfield's claim through step five, making the following findings of fact and conclusions of law with respect to Mr. Satterfield.

1.      "[Mr. Satterfield] meets the insured status requirements of the Social Security Act through March 31, 2014." (Tr. 16.)

2.      "[Mr. Satterfield] has not engaged in substantial gainful activity since June 10, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)."   (Tr. 16.)

3.      "[Mr. Satterfield] has the following severe impairments: type I diabetes, a back disorder, a right shoulder disorder and correctable left eye visual loss (20 CFR 404.1520(c) and 416.920(c))." (Tr. 16.)

4.      "[Mr. Satterfield] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." (Tr. 18.)

5.      "After careful consideration of the entire record, the undersigned finds that [Mr. Satterfield] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the ability to lift 12 pounds occasionally and 10 pounds frequently, sit a total of six hours and stand a total of two hours in an eight-hour workday.   He can occasionally walk, climb stairs, squat, bend/stoop, kneel, reach above the shoulders, push/pull with the right upper extremity, use foot control and drive an automatic vehicle.   He can frequently push/pull with the left upper extremity, turn arms and wrists, open and close fists and use his hands and fingers. He can continuously balance.   He some [sic] visual limitations with the left eye but somewhat corrected with lenses.   He has normal vision with the right eye and normal hearing, grip strength, and fine and manual dexterity.   He has no environmental limitations.   The claimant's memory is limited by two percent, but he is not off task in any area of mental functioning."  (Tr. 19.)

6.      "[Mr. Satterfield] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)."  (Tr. 31.)

7.      "[Mr. Satterfield] was born on March 21, 1965 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  [Mr. Satterfield] subsequently changed age category to a younger individual age 45–49 (20 CFR 404.1563 and 416.963)."  (Tr. 31–32.)

8.      "[Mr. Satterfield] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964)."  (Tr. 32.)

9.      "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Mr. Satterfield] is 'not disabled,' whether or not [Mr. Satterfield] has transferable job skills (*See* SSR 82–41 and 20 CFR Part 404, Subpart P, Appendix 2)."  (Tr. 32.)

10.     "Considering [Mr. Satterfield's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Mr. Satterfield] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))."  (Tr. 32.)

11.    "[Mr. Satterfield] has not been under a disability, as defined in the Social Security Act, from June 10, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g))."  (Tr. 33.)

In short, the ALJ concluded Mr. Satterfield does not have the residual functional capacity to perform past relevant work as a cashier, machine cleaner, plastic sheeting laborer, and artificial inseminator, but he can find employment in the national economy, and so he does not qualify as disabled.  (Tr. 15–33.)

### I: Rejection of Mr. Satterfield's Subjective Complaints

Mr. Satterfield argues the ALJ erred by improperly rejecting Mr. Satterfield's complaints regarding the severity of his symptoms.  (Pl's Reply Br. at 7–9, ECF No. 36.)  "'Credibility determinations are peculiarly the province of the finder of fact, and [a court] will not upset such determinations when supported by substantial evidence.'"  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Diaz v. Sec'y of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir. 1990)).  "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'"  *Id.* (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)).  If objective medical evidence shows a medical impairment that produces pain, the ALJ must consider the claimant's assertions of severe pain and decide the extent to which the ALJ believes the claimant's assertions.  *Id.*  To do this, the ALJ should consider such factors as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Id.* (citation and internal quotation marks omitted).  But this analysis "does not require a formalistic factor-by-factor recitation of the evidence.  So long as the ALJ sets forth the specific

evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied."
*Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

The ALJ found Mr. Satterfield's subjective complaints inconsistent with the objective
medical evidence of record.  (Tr. 21 ("[T]he claimant's statements concerning the intensity,
persistence, and limiting effects of [his] symptoms are not entirely credible…").)  Mr. Satterfield
claims the ALJ's Decision discounts his testimony that he has to check blood sugar and inject
insulin six to seven times per day for no reason.  (Pl.'s Br. 15, ECF No. 23.)  The ALJ found Mr.
Satterfield's testimony about diabetes symptoms only "'partially' credible."  (Tr. 27.)
Specifically, the ALJ found "the number of alleged bad days and his alleged loss of feeling with
the calf of his legs are not supported in the medical record."  (Tr. 27.)  The Decision fails to
address, however, Mr. Satterfield's testimony that he "check[s his] sugar six to seven times a
day."  (Pl.'s Br. 15, ECF No. 23; *see* tr. 27–28; tr. 386.)  Other evidence in the record supports
Mr. Satterfield's assertions:  Dan Heath, Mr. Satterfield's former employer, reported personally
observing Mr. Satterfield requiring "numerous stops" to check blood sugar levels and administer
insulin injections.  (Tr. 355.)  Dr. Weston—whom the ALJ accords "'great' weight"— also
reports Mr. Satterfield "checks his blood glucose 6 times a day."  (Tr. 29, 309.)  The Decision
does not address to what extent the ALJ found Mr. Satterfield credible on this issue, and if not,
why not.  (*See* tr. 27–28.)  Without this explanation, the Court cannot determine whether the ALJ
applied the correct law in evaluating Mr. Satterfield's credibility.

The ALJ's evaluation of Mr. Satterfield's memory complaints suffers from a related
defect.  In this instance, the ALJ did find Mr. Satterfield's claims of poor memory lacking in
credibility, concluding Mr. Satterfield has only "a very mild [memory] limitation [that] would
not preclude work activity."  (Tr. 27–28.)  The ALJ states, but does not explain how, the medical

record demonstrates only a two percent limitation.  (*Id*.)  Dr. Kockler, to whom the ALJ accorded

"'great' weight," found Mr. Satterfield's memory "below average."  (Tr. 29, 27 (*citing* tr. 290).)

The ALJ's failure to explain why he finds the medical record undermines Mr. Satterfield's

credibility regarding memory prevents this Court from determining whether the ALJ applied the

correct legal standards.  The Court's conclusion does not require the ALJ to reverse his

Decision—rather the ALJ must provide sufficient information for this Court to determine

whether the Decision rests upon the correct legal ground.  *See Kepler*, 68 F.3d at 391–92

(explaining the purpose of remand).

The Decision fails to address certain contradictory evidence in the record or mistakes the

evidence in the record.  These inconsistencies make reviewing the Decision impossible.  *See Lax*,

489 F.3d at 1084 (requiring courts to determine whether the ALJ followed the law regarding

weighing of evidence).  Therefore, the Court REMANDS the ALJ's credibility finding to permit

the ALJ to more thoroughly explain why he discredited Mr. Satterfield's testimony.

## II: Evaluation of the Treating Physician's Testimony

Mr. Satterfield argues the ALJ erred in his evaluation of Dr. Hendrix's, the treating

physician's, testimony by finding the asserted limitations unsupported by the medical record.

(Pl.'s Opening Br. 8–12, ECF No. 23.)  Dr. Hendrix opined that Mr. Satterfield's medical

conditions would result in his being off-task twenty-five percent of the workday and that he

would need two, fifteen to twenty minute, unscheduled breaks a day.  (Tr. 29–30.)  The ALJ

declared Dr. Hendrix a "'treating'" physician and gave "'great' weight to his medical findings

outlined in his progress records."  (Tr. 30.)  The ALJ found, however, "that the doctor has

identified medical conditions and/or limitations that are not supported by his objective medical

findings or objective medical findings from other sources" and accorded Dr. Hendrix's assessment of Mr. Satterfield's RFC "'little' weight."  (Tr. 30.)

An ALJ must evaluate every medical opinion.  20 C.F.R. § 404.1527(c).  If the ALJ finds a treating physician's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with the other substantial evidence in [the] case record," the ALJ must give the opinion controlling weight.  20 C.F.R. § 404.1527(c)(2).  When the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider certain factors.  20 C.F.R. section 404.1527(c) provides these factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*See* *Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (citation omitted).  To reject a medical opinion, the ALJ must provide "'specific, legitimate reasons.'"  *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (quoting *Miller v. Chater,* 99 F.3d 972, 976 (10th Cir. 1996)).

Yet the ALJ's decision need not *discuss explicitly* all of the factors for each of the medical opinions.  *See* *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (stating that a lack of discussion of each factor does not prevent the court from according the decision meaningful review).  When considering medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and inconsistencies.  *See* *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (noting that trier of fact resolves conflicts between medical evidence).  If no opinion receives controlling weight, the agency considers several factors in deciding how much weight to

give an opinion, including the nature of the medical source's relationship with the claimant, supportability, consistency, specialization, and other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1527(c)(1)–(6) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

Here, the ALJ did not find Dr. Hendrix's evaluation of Mr. Satterfield's RFC reliable, assigning it only "'little' weight." (Tr. 30.)  The Decision misstates some of the medical records and fails to explain its reasons for rejecting others, calling that finding into question. Specifically, the ALJ asserts "[Mr. Satterfield] did not complaint [sic] of having any pain with his feet." (Tr. 30.)  During an August 28, 2007 visit with Dr. Hendrix, however, Mr. Satterfield reported "pain on the anterior aspect of his left food with some swelling," and Dr. Hendrix observed "some [foot] swelling [and r]edness over the first metatarsophalangeal joint." (Tr. 189.)  While Dr. Hendrix's records also indicate Mr. Satterfield's foot occasionally appeared swollen since the onset date alleged, these records never mention pain. (*See, e.g.* tr. 188, 187, 231.)  While the ALJ misstates the record, the pain reflects one incident prior to the alleged disability onset date of June 10, 2009.  Thus, if this notation represented the ALJ's only misstatement, it would likely constitute harmless error.

The Decision also incorrectly asserts, however, that no doctor confirmed Mr. Satterfield had memory problems. (Tr. 30.)  But, in October 2011, Dr. Kockler rated Mr. Satterfield's memory functioning as "b[e]low average," seemingly confirming a memory problem. (Tr. 295.)

The ALJ also failed to explain why he discounted Dr. Hendrix's assertion that Mr. Satterfield requires two unscheduled breaks during each workday. (*See* tr. 30.)  Despite the ALJ's statement that this asserted limitation is "unsupportable," (tr. 30), Dr. Weston reported Mr.

Satterfield "checks his blood glucose 6 times a day." (Tr. 309.) The ALJ assigned Dr. Weston's findings "'great weight.'" (Tr. 29.) Other portions of the record make clear that Mr. Satterfield tests his blood sugar multiple times daily. (*See, e.g.* tr. 130, 309.) The ALJ never explains whether he discounts the number of breaks, the length of the breaks, the timing of the breaks, or why he discounts this point. Given these misstatements and omissions, the Court cannot determine whether the ALJ applied the law correctly in evaluating Dr. Hendrix's credibility in asserting that Mr. Satterfield will need two unscheduled breaks each workday. "The failure … to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993) (internal quotations and citations omitted).

Thus, the Court finds the ALJ did not provide enough information to allow the Court to review his decision to accord Dr. Hendrix's RFC analysis little weight and REMANDS the ALJ's evaluation of the medical opinion evidence for further explanation.

### III. The ALJ's RFC Determination

Mr. Satterfield contends the Court must reverse and remand the ALJ's RFC finding because the ALJ failed to consider Mr. Satterfield's memory problems and need for breaks properly. (Pl.'s Opening Br. 12, ECF No. 23.)

"RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her ability to do work-related physical and mental activities." Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *2, (July 2, 1996). The RFC reflects the most a person can do despite his limitations. *See id.* "Since the purpose of the credibility examination is to help the ALJ assess the claimant's RFC, the ALJ's

credibility and RFC determinations are inherently intertwined." *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009).  The claimant bears the burden of providing evidence used in making the RFC finding.  *See* 20 C.F.R. § 404.1545(a)(3).

Here, Mr. Satterfield provided Dr. Kockler's opinion, to which the ALJ assigned "'great' weight." (Tr. 29.)  Dr. Kockler found Mr. Satterfield's memory fell below average.  (Tr. 295.) The ALJ determined Mr. Satterfield's "memory is limited by two percent, but he is not off task in any area of mental functioning." (Tr. 19.)  The ALJ drew this conclusion without giving any explanation of how below average equates to two percent.  (*See* tr. 19, 27–29, 295).  The ALJ does not describe how he determined Mr. Satterfield's memory issues equaled a two percent limitation.  (*See* tr. 19–31.)  More importantly, the ALJ's opinion seems at points to forget the existence of Dr. Kockler's finding and Mr. Satterfield's repeated complaints:  "there is nothing in the medical record to support any significant problems in this area," (memory loss), (tr. 26); "[t]his [memory loss] was never confirmed by the doctor [Dr. Hendrix] or by a psychologist who performed a psychological evaluation of the claimant," (tr. 30).  Whether the ALJ fully considered Mr. Satterfield's memory issues as required by SSR 96-8p remains unclear.

Additionally, as noted earlier, Mr. Satterfield's testimony, Mr. Heath's letter, and Dr. Weston's records all suggest Mr. Satterfield must check his blood sugar levels and give himself insulin shots during the day.  (Tr. 386, 355, 309.)  The ALJ's RFC analysis concludes that Mr. Satterfield's "diabetes would not preclude work." (Tr. 25.)  However, the analysis does not indicate how or whether Mr. Satterfield's need to measure blood sugar and give himself insulin shots would impact his productivity or schedule.  (*See id.*)

These omissions prevent the Court from meaningfully reviewing whether the ALJ applied the law correctly when evaluating Mr. Satterfield's RFC.

The Court REMANDS the ALJ's RFC finding to permit the ALJ to explain more thoroughly his evaluation of Mr. Satterfield's memory issues and need to check blood sugar and give himself insulin shots.  The remand "do[es] not dictate any result.  [The Court's] remand simply assures that the correct legal standards are invoked in reaching a decision based on the facts of the case."  *Kepler*, 68 F.3d at 391–92 (citation and quotation marks omitted).

## CONCLUSION

Based on the foregoing, the Court cannot determine whether the ALJ applied the correct legal standards and thus REMANDS the Commissioner's decision in this case.

DATED this 15th day of June, 2015.

BY THE COURT:

Evelyn J. Furse
United States Magistrate Judge